FILED
CHARLOTTE, N.C.

02 FEB -1 PM 4: 17

U.S. DISTRICT COURT
W. DIST. OF N.C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

Civil Action No. 3 : 02 - CV 48 -V

| | |
|---|---|
| GREAT SOUTHERN LIFE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANGELA D. ADAMS; ANNIE L. ADKINS; NELLE L. BALDWIN; TYRONE D. BANKS; THOMAS I. BEAN; AUDREY G. BEASLEY; MABEL S. BECK; JAMES PAUL BECK; MABEL BECK; PECOLA W. BLACKBURN; OPAL I. BOYD; JAMIE Y. BROWN; CORINNE F. BRUTON; DEBRETTA BULLOCK; DEBRA P. CARDEN; VANESSA M. CARTER; VALERIA M. CEASAR; PHYLLIS B. CHISHOLM; SUZANNE J. CLEARY; JOANNE COLEMAN; LISA A. COLLINS; JEANETTE S. COX; MARIE CROTTS; VANESSA J. DANIELS; BEANIE T. DAVIS; JERRY W. EVANS; LULA G. FOOTE; LAWANDA S. FOOTE; LAWANDA FOOTE; LA DONNA M. FRENCH; KEWANEE E. FROST; TONI B. FULK; MONTALDO D. GOLDEN; STEPHANIE B. GOODSON; LISA A. GORDON; RICKY GREENE; ROSILAND N. HAIRSTON; CHRISTINE F. HALL; AVON HAMMONDS; MARY WOOLEN HANOLT; ROBERT HANOLT; RICHARD HARTMAN; SUSAN C. HARTMAN; LAURA A. HENSON; LAURA HENSON; ELIZABETH A. HICKS; CARLOS HICKS; JACQUELINE R. HILL; SHELBY J. HOLDEN; JACKIE D. HOOTS; VERNON GRAY HOOTS; SHIRLEY N. HOOTS; GRACE M. HORTON; DOROTHY M. HUTCHENS; DIANN S. HUTSON; NEDRA W. JACKSON; THOMAS L. JAMES; DOROTHY FRYE JONES; TRAVIS ASHLEY JONES; CHRISTEN S. JONES; ESTATE OF | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

NETTIE R. JONES; DEBBIE C. JOYCE; )
BEULAH JOYCE; KIMBERLY A. KILGORE; )
PERCY E. KNIGHT; CATHERINE H. )
LAMBRETH; LENORA W. LASH; )
CHARLES A. LEAK; BESSIE J. LEE; NINA )
B. LEE; KAY H. LUTHER; MARILYN )
MALCZEWSKI; FELICIA A. MARLIN; )
YVONNIA K. MARTIN; JAMES A. )
MARTIN; DEBRA W. MCBRIDE; LINDA D. )
MCCORKLE; VIRGUS L. MCCORKLE; )
WANDA L. MCEACHERN; MARGARET J. )
MEANS; KAREN R. MESSER; TERRIE L. )
MESSER; WILLIE M. MIDDLEBROOK; )
VICTOR A. MOODY; JANET L. MULLINS; )
EVELYN H. MURPHY; DENORRIS C. )
NICHOLS; KIMBERLY A. PEACOCK; )
RUBY PIERCE; VIRGINIA M. PIKE; )
ADLINE E. POTTER; DIANNA S. )
PRATHER; JOHN EDWARD QUIGLEY; )
LILLIAN F. RAWLINSON; BETTY H. RAY; )
ESTATE OF ELLIS T. REID; ELLIS T. REID )
JR; ANN RICH; GLENN A. RICHARDSON; )
JUDY A. RICHMOND; RICKY D. ROBBINS; )
TRACY Y. ROBINSON; WELBERT )
SALLEY; RHONDA M. SAUNDERS; )
ANGINITA SNUGGS; MARY SUE )
SPAINHOUR; ANN R. STEELMAN; )
SHARON D. STEWART; DERWIN TERRY; )
WANDA MABE TILLEY; WILLIE O. )
TOLLIVER; ELIZABETH TOWNSEND; )
KATHY S. TRANSOU; ALLEN L. )
TRANSOU; JAY W. TRIVETTE; ELLEN W. )
TUCKER; JOE G. VODENICHAR; ANDREA )
S. WADE; CAROLYN L. WAGNER; ROSE )
MARY WARD; WANDA K. WATSON; )
DAVID K. WEBB; MARION P. WEST; )
SHARON E. WESTMORELAND; DOROTHY )
F. WISHON; KATHY B. WOOD; JOSEPH N. )
WORRELL, )
)
    Defendants. )

---

## COMPLAINT FOR DECLARATORY RELIEF

---

Great Southern Life Insurance Company ("Great Southern") files this Complaint for Declaratory Relief, and respectfully shows as follows:

## I.

## PARTIES

1.     Great Southern is a life insurance company incorporated under the laws of the State of Texas with its principal place of business in Texas.

2.     The Defendants are all present or former Great Southern policyowners who are citizens of the State of North Carolina and who purport to have opted out of the settlement class certified in *In Re Great Southern Life Insurance Company Sales Practices Litigation,* MDL No. 1214, in the United States District Court for the Northern District of Texas (the "MDL Proceeding") and who have indicated to Great Southern in connection with or subsequent to their opt-out request that they are represented by legal counsel.

## II.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction because there is complete diversity and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332 and § 1367.

4.     The Court has personal jurisdiction over each of the Defendants because they are all residents and citizens of the State of North Carolina.

5.     Venue in this district is proper under 28 U.S.C. § 1391 because: (i) several of the Defendants reside in this district; (ii) a substantial part of the events or omissions giving rise to the disputed claims occurred in this district; and (iii) all the Defendants are otherwise subject to personal jurisdiction in this district.

# III.

## FACTS

6.     The Defendants are all present or former owners of one or more universal life insurance policies or excess interest whole life insurance policies issued by Great Southern since January 1, 1982.  As such, they were all members of a nationwide class that was certified in the MDL Proceeding by the Honorable Joe Kendall on or about March 14, 2000, as amended by order dated June 13, 2001.

7.     In the nationwide class action, the plaintiffs alleged that Great Southern engaged in a scheme to breach its policies of insurance and defraud its policyowners through certain alleged misconduct, including:

> a.     allegedly failing to compute the interest credits, mortality charges, and expense charges in accordance with the terms of the class policies;
>
> b.     allegedly designing and pricing the class policies in such a manner that Great Southern either knew or should have known that the policies would not perform as allegedly promised by Great Southern;
>
> c.     allegedly misrepresenting and failing to disclose certain material information regarding Great Southern's interest crediting rates, mortality charges, and expense charges with respect to the class policies; and
>
> d.     allegedly engaging in other misconduct as alleged in the Consolidated Second Amended Class Action Complaint attached hereto as Exhibit "1."

Great Southern has denied, and continues to deny, each of these allegations of misconduct.

8.     On or about April 6, 2001, Great Southern and the lead counsel for the nationwide class executed a proposed class-wide settlement.  Under the terms of the proposed settlement,

class members who did not wish to settle were given the opportunity to opt out of the nationwide class.

9.      Upon learning of the proposed settlement, attorneys across the country, including certain attorneys in the State of North Carolina, began running a series of television commercials and print advertisements soliciting class members to opt out of the nationwide class and engage their firms.

10.     Apparently in response to these opt out solicitations, the Defendants and over 1,200 other present and former Great Southern policyowners purported to opt out of the nationwide class and notified Great Southern that they had retained legal counsel to represent them.

11.     On or about January 14, 2002, Judge Kendall signed an order approving the nationwide class settlement and dismissing with prejudice the nationwide class action. The Defendants, however, have purported to opt out of the nationwide class and, therefore, assert that they are not bound by Judge Kendall's dismissal order. Thus, a dispute continues to exist between Great Southern, on the one hand, and the Defendants, on the other hand, as to whether Great Southern has any liability to the Defendants with respect to the allegations described in the Consolidated Second Amended Class Action Complaint attached hereto as Exhibit "1." This dispute is continuing and ongoing, and it is ripe for resolution by this Court.

12.     All conditions precedent to this action have occurred or been waived.

## IV.

## CAUSE OF ACTION

13.     The allegations in paragraphs 1-12 are incorporated by reference.

14.     Pursuant to 28 U.S.C. § 2201 and any other applicable rule or law, Great Southern

requests that the Court issue a declaratory judgment that:

    a.    Great Southern's practices and procedures for crediting interest and deducting mortality and expense charges on the universal life and excess interest whole life insurance policies owned by the Defendants do not violate the terms of those policies; and

    b.    Great Southern has no liability to the Defendants with respect to the matters alleged in the Consolidated Second Amended Class Action Complaint attached hereto as Exhibit "1."

15.    Alternatively, in the event that the Court concludes that the joinder of all the Defendants in this action is impracticable, Great Southern requests that the Court: (i) certify the Defendants as a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure; (ii) appoint one or more of the Defendants as a class representative; and (iii) issue the declaratory relief described above.

WHEREFORE, Great Southern respectfully requests that the Defendants be cited to appear and answer herein and that, after hearing or trial, the Court issue a final judgment:

    a.    declaring the rights of Great Southern and the Defendants, as set forth above;

    b.    awarding Great Southern its attorneys' fees, expenses, and costs of court to the extent permitted by applicable law; and

    c.    awarding Great Southern such other and further relief to which it is justly entitled.

This the 1st day of February, 2002.

Curtis J. Shipley
State Bar No. 19276
MOORE & VAN ALLEN, PLLC
Bank of America Corporate Center
100 N. Tryon Street, Floor 47
Charlotte, NC 28202-4003
Telephone: (704) 331-1000

ATTORNEYS FOR GREAT SOUTHERN
LIFE INSURANCE COMPANY

**OF COUNSEL:**

EDWIN R. DEYOUNG
Texas State Bar No. 05673000
ROGER B. COWIE
Texas State Bar No. 00783886
DAVID G. CABRALES
Texas State Bar No. 00787179
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Telephone: 214/740-8000
Telecopier: 214/740-8800

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re GREAT SOUTHERN LIFE INSURANCE COMPANY SALES PRACTICES LITIGATION | § § § § § | MDL Docket No. 1214 |
| Relating to | § § | |
| IRWIN GINSBERG, | § § | Case No. 3:98-CV-1249-X |
| Plaintiff, | § § | |
| vs. | § § | |
| GREAT SOUTHERN LIFE INSURANCE COMPANY, AMERICO LIFE, INC. | § § § | |
| Defendants. | § § | |
| ISAAC NORMAN, | § | Case No. 3:98-CV-1617-X |
| Plaintiff, | § § § | |
| vs. | § § | |
| GREAT SOUTHERN LIFE INSURANCE COMPANY, AMERICO LIFE, INC. | § § § | |
| Defendants. | § § | |
| HARRIET D. MANN, | § § | Case No. 3:98-CV-1618-X |
| Plaintiff, | § § | |
| vs. | § § | |
| GREAT SOUTHERN LIFE INSURANCE COMPANY, AMERICO LIFE, INC. | § § § | |
| Defendant. | § § | |

[Caption continued on following page.]

YVONNE H. MASSEY,                              § Case No. 3:98-CV-1619-X
                                              §
                            Plaintiff,        §
                                              §
        vs.                                   §
                                              §
GREAT SOUTHERN LIFE INSURANCE                 §
COMPANY, AMERICO LIFE, INC.                   §
                                              §
                            Defendant.        § Plaintiffs Demand A
                                              § Trial By Jury

PLAINTIFFS' [PROPOSED] CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

I. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . 1

II. THE PARTIES . . . . . . . . . . . . . . . . . . . . . . 2

III. GREAT SOUTHERN'S NATIONWIDE DECEPTIVE SALES SCHEME . . . . 4

    A. Great Southern's Deceptive Policy Performance, Retirement And Vanishing Premium Sales Practices . 12

    B. Great Southern's Deceptive Replacement Sales Practice . . . . . . . . . . . . . . . . . . . . . . 18

    C. Great Southern's Additional Deceptive Practices . . . . . . . . . . . . . . . . . . . . . . . 20

    D. Great Southern Breached The Terms Of Its Contracts . . . . . . . . . . . . . . . . . . . . . . 20

      1. Great Southern Artificially Manipulated Its Interest Crediting Rates . . . . . . . . . . . . 20

      2. Great Southern Breached The Policy Contract Regarding Cost Of Insurance . . . . . . . . . . 22

      3. Great Southern Breached The Performance Terms Of Its Contract . . . . . . . . . . . . . . . . . 23

IV. GREAT SOUTHERN FAILED TO DISCLOSE MATERIAL INFORMATION AFFECTING THE PERFORMANCE OF THE POLICIES . . . . . . . 24

V. GREAT SOUTHERN'S FRAUDULENT CONCEALMENT OF ITS NATIONWIDE FRAUDULENT SCHEME . . . . . . . . . . . . . . . . . . . 31

VI. GREAT SOUTHERN'S FIDUCIARY DUTY AND RELATIONSHIP OF TRUST AND CONFIDENCE TO PLAINTIFFS AND CLASS MEMBERS . . . . . 34

VII. GREAT SOUTHERN'S INADEQUATE TRAINING AND SUPERVISION OF AGENTS . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII. FACTS RELATING TO EACH NAMED PLAINTIFF . . . . . . . 39

    A. The Solicitation And Sale Of Harriet D. Mann's Policy . . . . . . . . . . . . . . . . . . . . . . . 39

    B. The Solicitation And Sale Of Irwin Ginsberg's Policy . . . . . . . . . . . . . . . . . . . . . . . 40

i -

C.   The Solicitation And Sale Of Isaac Norman's Policy   43

D.   The Solicitation And Sale Of Yvonne Massey's Policy
. . . . . . . . . . . . . . . . . . . . . . . . . .   44

IX.   INJURY TO THE CLASS . . . . . . . . . . . . . . . . .   45

X.   CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . .   48

XI.   CAUSES OF ACTION . . . . . . . . . . . . . . . . . . .   54

A.   FIRST CAUSE OF ACTION
(Breach of Contract)   . . . . . . . . . .   54

B.   SECOND CAUSE OF ACTION
(Violation of Tex. Bus. & Comm. Code
§§17.46(a) and (b)(5), (9) and (23))   . .   58

C.   THIRD CAUSE OF ACTION (Fraud, Fraudulent
Concealment and Deceit) . . . . . . . . .   60

D.   FOURTH CAUSE OF ACTION
(Unjust Enrichment)   . . . . . . . . . .   64

E.   FIFTH CAUSE OF ACTION
(Declaratory and Injunctive Relief –
Breach of Contract) . . . . . . . . . .   64

F.   SIXTH CAUSE OF ACTION
(Reformation) . . . . . . . . . . . . . .   66

G.   SEVENTH CAUSE OF ACTION
(Negligent Supervision) . . . . . . . . .   68

XII.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . .   69

- 11 -

Plaintiffs bring this action in their individual capacities and on behalf of the Class defined below, and for their Second Amended Complaint against defendant Great Southern Life Insurance Company ("Great Southern" or the "Company") allege, upon knowledge as to themselves and their own acts and otherwise upon information and belief based on plaintiffs' investigation to date, as follows:

I.   JURISDICTION AND VENUE

1.   This Court has jurisdiction over plaintiffs Ginsberg, Mann and Massey pursuant to 28 U.S.C. §§1332 and 1367. Plaintiff Norman initially filed his case in the District Court of Jasper County Texas and was removed to Federal Court on Great Southern's motion asserting jurisdiction under the Employee Retirement Income Security Act, 29 U.S.C. §1001, et seq. Plaintiffs are citizens of the States of Florida, Texas and Alabama. Defendant Great Southern is a Texas corporation with its principal place of business in Dallas. The amount of plaintiffs' damages exceeds $75,000, as plaintiffs lost more than $75,000 (exclusive of interest and costs) in insurance coverage, premiums, dividends, interest, and/or accumulated cash values as a direct and proximate result of the deceptive scheme and common course of conduct alleged here. The amount in controversy also exceeds $75,000 by virtue of the punitive damages, attorneys' fees, costs and equitable relief requested in which all plaintiffs and Class Members have a common and undivided interest in such amounts based on Great Southern's fraudulent and wrongful conduct as described here.

- 1 -

2.   Venue in this district is pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, Docket No. 1214, dated on or about May 5, 1998, consolidating various actions pending against Great Southern throughout the United States.

II.  THE PARTIES

3.   Harriet D. Mann is a citizen and resident of the State of Florida.   In 1987, as discussed in ¶¶77-78 below, Ms. Mann purchased a Great Southern life insurance policy with an initial face amount of $100,000.

4.   Plaintiff Irwin Ginsberg is a citizen and resident of the State of Florida.   In 1985, as discussed in ¶¶79-84 below, Mr. Ginsberg purchased a Great Southern life insurance policy with an initial face value of $200,000.

5.   Plaintiff Isaac Norman is a citizen and resident of the State of Texas.  In 1986, as discussed in ¶¶85-89 below, Mr. Norman purchased a Great Southern life insurance policy with an initial face value of $300,000, insuring the life of his wife, Frances Norman.

6.   Plaintiff Yvonne H. Massey is a citizen and resident of the State of Alabama.   Ms. Massey owned a $50,000 Great Southern whole life policy issued in 1980.  In 1982, as discussed more fully in ¶¶90-93 below, Great Southern convinced Ms. Massey to surrender her 1980 policy and to purchase a new Great Southern life insurance policy with an initial face value of $50,000.

7.   Defendant Great Southern is a stock life insurance company, originally incorporated in Texas in 1909, with its main

- 2 -

administrative offices in Dallas, Texas. Great Southern is a
wholly owned subsidiary of United Fidelity Life Insurance Company,
which is, in turn, a wholly owned subsidiary of Americo Life, Inc.
("Americo"). Great Southern is Americo's leading life insurance
company and primary marketing arm.

8.   Great Southern has over one billion dollars in assets,
and derives the bulk of its premium income through the marketing
and sale of universal life insurance and other interest sensitive
life insurance products. Great Southern markets and sells its life
insurance policies in 46 states and the District of Columbia. The
Company uses a nationwide network of general and soliciting agents
and marketing organizations which it directs and trains in selling
its products through manuals, seminars, product bulletins, sales
materials and Policy illustration software designed, approved and
disseminated by Great Southern.

9.   All of the products sold by Great Southern are designed,
underwritten and issued from Great Southern's headquarters in
Texas.   The key decisions regarding product design, pricing
assumptions, product development and marketing are made in Great
Southern's headquarters in Texas. Further, sales presentations,
Policy illustrations and other information used in the solicitation
and sale of Policies to the public, including hardware and software
used to generate such materials are prepared, approved and provided
by Great Southern from its Dallas offices.   Thus, all of the
wrongful conduct in support of Great Southern's uniform nationwide

- 3 -

deceptive scheme and common course of conduct emanates from Great
Southern's headquarters in Texas.

III. GREAT SOUTHERN'S NATIONWIDE DECEPTIVE SALES SCHEME

10. Beginning in the early 1980s, interest rates reached
record highs. Great Southern faced massive losses of capital as
policyowners began to take money from their life insurance policies
to invest in financial vehicles providing much higher rates of
return. At the same time, Great Southern was facing fierce
competition in the life insurance market from new, aggressive
competitors, such as the now defunct Executive Life, which were
promising double-digit yields on their whole life policies, fueled
by investments in high risk junk bonds and other speculative
investments. Companies such as A.L. Williams, and later,
Primerica, were aggressively encouraging policyowners to surrender
their traditional whole life insurance policies to "buy term and
invest the difference."

11. In an effort to stem this tide and to capture the high
interest rates for competitive advantage, Great Southern devised
and implemented a scheme to regain its competitive position in the
life insurance marketplace. Great Southern began to design,
introduce and market new, complex, excess interest whole life and
universal life insurance products and acquired, assumed or
purchased through reinsurance such policies issued by other life
insurance companies (the "Policies" or "Policy"). These Policies
were highly leveraged, volatile and extremely sensitive to changes
in prevailing interest rates and other pricing assumptions.

- 4 -

12.  In these interest-sensitive Policies, the policyowner pays a specified premium. From that premium, the company deducts the agent's commissions, sales charges, certain monthly deductions, mortality and other costs of insurance.  Great Southern then credits the excess premium to the Policy's account value and invests it in various financial instruments.  Great Southern credits a portion of the earned interest on this excess premium back into the Policy.  Great Southern guarantees that the interest credited will not fall below a minimum interest rate, usually between 3.0-4.5%.  Interest higher than the guaranteed amount is credited to the Policy pursuant to the terms of the Policy. Interest credited to the Policy and costs of insurance are key elements in determining how a Policy will perform -- i.e., how much money will be credited to account values which will be able to accrue interest and other earnings.  Even nominal changes in these values can have a dramatic impact on Policy performance.[1]

13.  By the beginning of 1982, Great Southern initiated its scheme by using a number of deceptive sales practices to induce prospective policyowners to purchase its products, including the "vanishing premium" and policy performance sales practices, its retirement/investment sales practice, and a replacement sales

---

[1]     For instance, in 1986, according to Great Southern, the projected account value on a $500,000 face value Lifetime Life Policy at the interest rate of 10%, differed from that at 9% on the same premium payments by over $700,000 -- the projected cash value dropped nearly three quarters of a million dollars with only a one percent drop in interest rates!  Great Southern never explained the risks of this volatility to prospective policyowners.

- 5 -

practice. These sales practices focused primarily on premises of
Policy performance in terms of cash values, cash accumulation,
and/or the number of out-of-pocket premium payments required to
maintain the Policy throughout its life.

14. Under Great Southern's vanishing premium and policy
performance sales practices, Great Southern marketed volatile and
highly interest-sensitive Policies by illustrating that a single
lump sum premium payment made at the time of sale, or a specified
number of premiums made during the initial years of the Policies,
would be sufficient to maintain the Policies for the lives of the
insureds with no further out-of-pocket cash premium payments. With
this premium schedule, Great Southern promised that the Policies
would provide substantial cash surrender values in later years and
level or increasing death benefits. Alternatively, Great Southern
promised that, based on level premium payments agreed upon at the
time of sale, the Policies would remain in force during the
Policyowner's life, earning the illustrated death benefits and cash
values over the life of the Policies.

15. In one permutation of this policy performance sales
practice, Great Southern marketed its products, based on
illustrated policy performance, as ideal retirement or investment
vehicles. Great Southern would compare these life insurance
policies to mutual funds, Individual Retirement Accounts, 401(k)s
or Certificates of Deposit -- downplaying the fact that the product
being purchased was merely a life insurance product and failing to
disclose that a substantial portion of the premiums would not go

- 6 -

toward an investment account, but would be used to pay commissions and mortality charges to purchase insurance.

16. In marketing its Policies, moreover, Great Southern failed to disclose to policyowners, or disclosed only in the most vague, unintelligible and boilerplate terms, the basic mechanics of these complex products, that maintaining premiums at the illustrated levels and the ability of cash values to accrue as represented depended heavily upon a series of actuarial assumptions, including interest earned on the Company's investment portfolio, the manner in which Great Southern allocated that income across policy groups as interest and/or dividends, the Company's mortality experience or "anticipated experience," and expenses. Great Southern also failed to disclose that its investment portfolio was very risky, its holding company was highly leveraged and that Great Southern's financial reinsurance repayment obligations were substantial, each interfering with Great Southern's ability to maintain the Policies as represented and promised.

17. Great Southern also used these sophisticated products improperly to upgrade its business by encouraging policyowners to replace their existing life insurance products, whether issued by Great Southern or someone else, with Great Southern's new interest-sensitive products.[2] Great Southern represented to policyowners

_____
[2] This sales practice is frequently called "churning," "improper replacement," "twisting," or "piggybacking." "Twisting" is normally used in the life insurance industry to refer to a situation where cash value is removed or surrendered

- 7 -

that they could purchase new Policies with increased death benefits
and cash accumulations by tapping into the accumulated values of
their existing Policies through surrenders, the use of the dividend
or interest streams, or Policy loans, to pay the premiums on the
new Policy. Great Southern promised that the policyowner would get
two Policies for the price of one, or that the new replacement
Policies would pay higher interest rates and/or dividends and
increased death benefits with few, if any, additional out-of-pocket
premium payments.

18.  In its replacement practice, Great Southern did not
disclose, however, that the ability of the existing policy to pay
for the new Policy depended on the ability of the replacing Policy
to perform as represented. Great Southern also failed to disclose
that the policyowner would be subject to substantial new sales
loads, surrender fees, administrative charges, Policy fees,
interest from Policy loans and other acquisition costs on the new
Policy. Great Southern never informed prospective policyowners
that he or she must pay large sales commissions on the new Policy,
sometimes as high as 100% of the first year annual premium.

19.  Policyowners could not know that Great Southern's
promised policy performance and various dates would fail, that the

_____

from an existing Policy issued by another company through means
of deception and used to acquire a new Policy. The term
"piggybacking" is normally used where cash value is removed from
a Policy and used to acquire another Policy issued by the same
company. Insurance companies sometimes euphemistically refer to
some or all of these practices as "financed life insurance."
These practices are prohibited by statute or common law in every
state.

- 8 -

projected cash values could not be attained and that premium payments beyond those specified would eventually be required. Even if policyowners understood that interest rates on financial markets generally were changing, they had no way of knowing either the dramatic impact of those changes on their Policies, nor the fact that Great Southern was, after the sale, adjusting the stated credited interest rate and cost of insurance downward so that the Policies would never perform as promised.

20.  Great Southern sold its Policies by providing potential policyowners with sales presentations and computer generated Policy illustrations demonstrating in columnar format how the Policy would perform.  The Company even developed and introduced interactive, multimedia sales presentation software to assist its agents in new life insurance sales.  All sales presentations and other marketing materials used in connection with the sale of Great Southern's insurance products, including computer software used to generate policy illustrations, were developed, approved, and disseminated by Great Southern.

21.  Great Southern knew that the sales materials provided to its agents failed to disclose material facts necessary for the prospective policyowner to make an informed purchase decision. Great Southern failed, however, to educate or train its agents to insure that proper disclosures were made to prospective policyowners about the material risks and speculative assumptions, and policy design features underlying the Policies.  Indeed, the bases for and operation of defendant's actuarial manipulations were

- 9 -

known only to a handful of key officers and consultants at defendant's home office.    Great Southern never revealed this information to its agents or its policyowners.

22.   Great Southern's contracts of insurance contain express provisions which spell out how interest crediting rates and costs of insurance -- both key factors in the performance of a policy -- will be determined.   For interest crediting rates, Great Southern promised that rates would be determined based on the Company's "expectation of future interest rates."  Great Southern's Policies also stated that cost of insurance rates would be based on the Company's "expectation as to future mortality experience."

23.   In the second phase of defendant's scheme, once the prospective policyowner was "hooked"     i.e., had purchased a Policy -- in an effort to increase their own profits, Great Southern continuously and uniformly breached these express Policy provisions by basing their determination of interest crediting rates and costs of insurance on numerous undisclosed factors and pricing assumptions other than or in addition to the factors specified in the Policy language.  Great Southern manipulated its interest crediting rates and other factors on the basis of the Company's desired competitive position by using a host of undisclosed actuarial manipulations, including direct recognition, first year "teaser" rates illustrated over the life of the Policy, non-guaranteed persistency bonuses, undisclosed changes in interest rate margins, assumed improvements in mortality, expenses and investment experience, improper imposition of the DAC tax and use

- 10 -

of an undisclosed "R-Factor." Using these artifices, Great Southern then credited lower interest rates and higher costs of insurance than its stated "current rate" or than represented in its sales materials and Policy illustrations.

24. As more and more of the Policies sold pursuant to Great Southern's sales scheme failed, Great Southern affirmatively concealed the failures of the Policies to perform as promised. When policyowners would question Great Southern's demand for additional premiums, Great Southern told them that the request was a computer error and just to ignore it. When it could no longer conceal these failures, Great Southern demanded that policyowners either pay additional premiums to maintain their Policies or forfeit them.

25. Great Southern's scheme has generated millions of dollars of profits for Great Southern. Plaintiffs and Class Members, however, have been placed in the untenable position of having to choose between paying premiums for which they neither bargained nor budgeted, attempting to maintain Policies whose performance has deteriorated dramatically and will never achieve the levels promised, and whose costs, contrary to the agreement, have soared, or allowing their Policies to lapse. Great Southern's response to this dilemma has been to blame policyowners for being naive enough not to know of those undisclosed material facts and their impact on the Policies; or to believe that the sales presentations, marketing materials and Policy illustrations Great Southern provided were accurate and truthful; or to assume that Great Southern would

11

operate in accordance with the express terms of its Policies.
Plaintiffs and Class Members will now be forced to pay millions of
dollars in out-of-pocket premiums they never agreed, budgeted or
expected to pay.    Plaintiffs and Class Members must also pay
interest on Policy loans they never agreed to or were aware of.
Moreover, plaintiffs and Class Members have lost and/or face the
prospect of losing millions of dollars in death benefits, cash
values, accumulated account values and surrender charges due to
their inability or unwillingness to make additional payments. Many
Class Members have now become uninsurable and will be unable to
obtain additional insurance.    Without the equitable and other
relief requested in this Second Amended Complaint, plaintiffs and
the Class will suffer irreparable harm.

    A.    Great Southern's Deceptive Policy Performance,
        Retirement And Vanishing Premium Sales Practices

    26.    In Great Southern's policy performance and retirement
sales practices, prospective policyowners were given sales
presentations demonstrating how the Policy's values    death
benefits and cash accumulations -- would grow for each year of the
Policy's life and the schedule of premiums necessary to sustain
those values.    These projected values were based on the concept
that the accumulated dividends and/or interest and other credits
would sustain the Policies.

    27.    Great Southern's vanishing premium payment plan was based
on a similar concept with an additional twist.    There, Great
Southern represented that a limited and specified number of premium

- 12 -

payments in the Policy's initial years would be sufficient to sustain the Policy over its entire life. After a specified number of out-of-pocket payments, the premiums would "vanish." As in the policy performance sales practice, this vanishing premium practice was based on the concept that all premiums after the "vanish year" would be paid from accumulated dividends and/or interest and other credits, the surrender of paid-up additions, policy loans, internal borrowings or some combination of these -- but not the policyowner's out-of-pocket cash.

28. At the heart of Great Southern's nationwide fraudulent scheme was its ability to make its Policies appear to perform better than those of its competitors in its sales materials. In effect, Great Southern sold its Policies by promising Policy performance and vanish dates that it knew would not be sustained over the 20-40 year life of the Policy, based on the volatility of its pricing assumptions and its own product design. Those promises became part of the contract of insurance.

29. Great Southern achieved this apparently "enhanced" performance by failing to disclose the actuarial manipulations built into the Policy design that, once the Policy was sold, acted to reduce interest crediting rates and increase the costs of insurance actually applied to the Policy. Great Southern knew at the time it sold its interest-sensitive Policies to plaintiffs and the Class that its Policies would not and could not be credited with sufficient values to vanish or to perform as illustrated --

- 13 -

they were never designed to. Thus, from day one of the Policy's life it would not and could not perform as promised.

30. Great Southern used these actuarial manipulations to adjust these rates downward at its own discretion in order to enhance profits. For instance, in designing these new volatile Policies, Great Southern proposed building in a substantial increase in its own interest margin beginning in the sixth year of the Policy -- in some cases by 75-100 basis points. Even if Great Southern's declared current interest crediting rate never changed, this manipulation had the effect of reducing the policyowner's *effective* interest credited to the Policy beginning in year six. This effective reduction in the interest crediting rate could have a dramatic effect on the Policy's cash values as a result of the loss of interest compounded over the life of the Policy. Neither this element of Policy design, nor its impact was ever disclosed to Great Southern's agents or policyowners.[3]

31. Great Southern also used a hybrid method of crediting interest. For some products, Great Southern would pay the higher New Money rate for the initial Policy years, then switch to the lower portfolio rate for the subsequent years. Great Southern, however, would project Policy performance or vanish dates to prospective policyowners as if the high early year rate applied for

---

[3]     In order to induce potential policyowners to purchase the Policy, in its Policy illustrations, Great Southern would illustrate Policy performance at the initial rate for the life of the Policy, never disclosing the effective rate reduction after year six.

- 14 -

the entire life of the Policy, in essence, using an undisclosed "teaser" rate.

32. Under the concept of "direct recognition," Great Southern systematically manipulated the interest crediting rate a Policy would receive when the policyowner took a loan against the Policy. Great Southern did not inform plaintiffs and Class Members that Policy Loans, coupled with Great Southern's direct recognition practice, would significantly affect Policy performance (and the vanishing premium mechanism of their Policy) substantially increasing the number of years it would take for the premiums to "vanish," or reducing the account values.[4]

33. In designing and pricing these new products, Great Southern also improperly assumed a high level of persistency bonuses (bonuses paid on policies that remain in force for a certain number of years). Persistency bonuses have been widely condemned by regulators and industry critics. Great Southern also included these persistency bonuses in its sales materials to allow it to illustrate at an enhanced, but unachievable, crediting rate as part of its fraudulent inducement of Policy owners to purchase these products.

34. In addition, in about 1991 Great Southern improperly began assessing a "deferred acquisition cost," commonly referred to as the "DAC Tax," against these policies. In breach of its Policy

---

[4]    While Great Southern's policy stated that direct recognition would apply, it never meaningfully explained to policyowners the impact of the reduced interest crediting rate applied to the Policy on the Policy's performance or vanish date.

- 15 -

provisions, Great Southern passed this tax on to policyowners in part by **decreasing the interest** credited to the Policies by 1/4 percent or by **increasing Policy cost of insurance rates and sales loads**.

35.    Beginning in approximately 1986, defendant introduced the "R-Factor," specifically designed as an undisclosed adjustment to the cost of insurance in order to maintain a particular predetermined profit margin.  The R-Factor operated to extract the bulk of Great Southern's profits in the first ten years of the policy's life, which is generally the period when most Policies lapse.[5] The R-Factor is a function of the age of the insured and the residual amount accrued in the Policy's cash accumulation account.    Mechanically, the R-Factor operated on the policy's account values in a manner to reduce the Company's Net Amount at Risk, a key factor in determining mortality charges.     Great Southern used the R-Factor to disguise its true cost of insurance. Throughout the Class Period, as Great Southern experienced stunning increases in mortality, rather than raise the cost of insurance (which would impact sales), the Company would adjust the undisclosed R-Factor.  Great Southern's use of the R-Factor like direct recognition, has the effect of penalizing insureds who have withdrawn some of their cash value.  Use of the R-Factor allowed

---

[5]    Contrary to conventional wisdom, the majority of life insurance Policies do not result in a death benefit being paid, but instead, are lapsed or otherwise terminated in the early years of the Policy.

- 16 -

Great Southern to illustrate policy performance which appeared to greatly outperform its competitors.

38. Great Southern also manipulated its investment portfolios. Great Southern employed undisclosed investment management concepts such as the New Money Method. For years Great Southern had used the so-called "portfolio" method to determine the investments component of credited interest rates. As interest rates rose during the early 1980s, Great Southern changed its interest crediting methodology and began using the New Money Method. The New Money Method magnifies the risk and volatility of the interest crediting and dividends the Policies would actually receive.[6] Under the New Money Method, each premium dollar received on a particular Policy series is "pooled" and placed into a separate investment "bucket." The "pools" are concentrated in investments such as mortgages which are extremely sensitive to interest rate fluctuations such that even incremental reductions in market interest rates could dramatically affect the dividends and interest payable on the Policies. Great Southern failed to disclose that it intentionally alternated between investment methodologies depending on which method would best enhance its

---

[6]    The New Money Method is a method of crediting Policy interest on each new premium with an interest rate consistent with what is then available in the investment market. It allocates investment earnings into separate funds received during a given time period based on investments made during that time period. When interest rates were high or rising as in the early to mid-1980s, New Money-based products illustrated results that were represented to be superior to portfolio-based products. This is because illustrations assumed the New Money rate would always remain at that higher level compared to the portfolio rate.

- 17 -

FEB 01 2002 11:30 AM FR MUA CHAS          843 5797099 TO ##03281#17043781 P.39

competitive position, at the expense of Policy performance or the risks associated with these Policies.

37. With regard to Great Southern's investment portfolio underlying its products, the Company did not disclose that a substantial portion of its investments were comprised of highly risky and volatile below-investment grade bonds, (so-called "junk bonds"), and collateralized mortgage obligations ("CMOs") that are extremely volatile to interest rate fluctuations. For example, A.M. Best, an industry rating publication company, notes that a relatively large percentage of Great Southern's bond portfolio is invested in CMOs and mortgage-backed securities (approximately 51% of the total bond portfolio). Although some of these investments are in the less risky classes, there is some exposure to the higher risk, unrated "Z" and residual classes which augments Great Southern's exposure to interest risk in its portfolio. During 1997 these "Z" class investments represented nearly 50% of Great Southern income earnings stream. Finally, America was highly leveraged with both public and private debt, service of which significantly constrained Great Southern's capitalization, cash flow and operations.

B.  Great Southern's Deceptive Replacement Sales Practice

38. Great Southern also engaged in systematic improper replacement or churning of policyowners' Policies. The term "churning" describes the practice of improperly depleting the accumulated cash value from an existing life insurance policy

- 18 -

Case 3:02-cv-00048-RLV-CH   Document 1   Filed 02/01/02   Page 29 of 85

(either by surrender of cash values or by borrowing against the cash value) to acquire a new insurance Policy or annuity.

39. For replacements, Great Southern promised that the policyowner would receive a new or additional Policy with greater death benefits or cash values for a specified level of out-of-pocket premiums or at no additional cost.

40. Great Southern uniformly failed to inform plaintiffs and Class Members, however, that they would lose substantial cash values and accumulation values in their existing policies, be required to pay new and significant commission charges, be subject to new contestability clauses, lose avocation and medical waivers and pay more for insurance as they were purchasing insurance at an older insurable age. Great Southern also failed to inform policyowners that, in many instances, their new Policies would be financed with unauthorized loans taken against the cash or accumulated values in their existing policies, that the new Great Southern Policy was volatile and interest-sensitive, or that the additional benefits of their new Policy were dependent upon aggressive and unattainable pricing assumptions. This misconduct allowed Great Southern to strip the accumulated cash values from policyowners' existing policies in order to finance new Policies and to collect substantial interest on the policy loans which were secured by underlying cash and accumulated values.

41. Great Southern frequently employed the policy performance and vanishing premium sales practices as an inducement to effectuate a churn. Thus, the policyowner was deceived into

replacing a policy with substantial accrued cash value for a Policy which promised greater benefits, but whose performance rapidly deteriorated due to Great Southern's undisclosed actuarial manipulations which reduced the interest credited to the Policy and increased the cost. Frequently the policyowner ended up going from a paid-up policy to virtually no policy at all, incurring substantial policy loans, with interest, along the way.

C.   **Great Southern's Additional Deceptive Practices**

42.  In furtherance of its scheme, Great Southern employed additional deceptive practices, including failing to properly and adequately disclose the true nature and cost of the Policies, failing to adhere to suitability guidelines when selling the Policies, failing to render proper advice concerning the underlying investments associated with the Policies, and failing to properly administer the Policies to the benefit of Great Southern and the detriment of Class members.

D.   **Great Southern Breached The Terms Of Its Contracts**

43.  Great Southern regularly and systematically breached at least three express provisions of its Policy terms: (a) the provision on "Interest Rate," (b) the provision on Cost of Insurance and (c) the provision on Cost of Insurance Rates.

1.   **Great Southern Artificially Manipulated Its Interest Crediting Rates**

44.  As discussed, Great Southern's Policy contracts stated the bases on which it would determine interest crediting rates. For interest-sensitive whole life Policies, the Policy promised:

Thereafter, interest in excess of the guaranteed interest rate described above may be applied to the accumulated amount at such increased rates and in such manner as the Company may determine from time to time *based on the Company's expectation of future interest rates.*

45.  For its universal life policies, Great Southern promised:

Interest in excess of the above rate may be credited to the accumulation account at the option of the Company *based on its expectation as to future interest rates.*

46.  No other factors were identified or disclosed.

47.  Despite this explicit provision, Great Southern used many of the actuarial manipulations described above to manipulate the current interest crediting rate in order to maximize its own profits. For instance, Great Southern employed direct recognition, the New Money method, teaser rates, undisclosed pricing assumptions, imposition of the DAC tax and other artifices as described in ¶¶29-37 above, to reduce the policyowner's effective earned interest credited to the Policy. This effective reduction in the interest crediting rate had a dramatic effect on the Policy's cash values as a result of the loss of interest compounded over the life of the Policy. Neither this Policy design, nor its impact was ever disclosed to Great Southern's agents or policyowners.[7] In contrast to the mathematical precision inferred in the express Policy language, the rates were set solely at the Company's discretion with little or no justification or

_____

[7]  In order to induce potential policyowners to purchase the Policy, in its Policy illustrations, Great Southern would illustrate Policy performance at the initial rate for the life of the Policy, never disclosing the subsequent effective rate reduction.

- 21 -

documentation other than **Great Southern's** desire to improve its profits. The use of these actuarial devices breached the express terms of this Policy provision.

## 2. Great Southern Breached The Policy Contract Regarding Cost Of Insurance

48. As discussed, **Great Southern's** Policy language provided a formula to calculate the cost of insurance based on the Cost of Insurance Rate, the amount of death benefit and the cash value. The Policy contract stated:

Cost Of Insurance:

1. The cost of insurance for the policy is calculated as (a) multiplied by the result of (b) minus (c) where:

> (a) is the cost of insurance rates as described in the Cost of Insurance Rate section;
> (b) is the insured's death benefit at the beginning of the policy month divided by 1.0036748;
> (c) is the cash value at the beginning of the policy month as described in the cash value section.

Divide the result by $1,000.

\* \* \*

Cost Of Insurance Rate:

. . . the monthly guaranteed cost of insurance rates shown in the Commissioner's 1980 Standard Ordinary Mortality Table, Age Last Birthday. Monthly cost of insurance rates will be determined by the Company *based on its expectation as to future mortality experience.*

Contrary to this formula, Great Southern adjusted its mortality experience for pricing purposes based predominantly on Great Southern's projected profit margins and other competitive considerations. Great Southern adjusted its Cost of Insurance Rate

based on a variety of other undisclosed factors, which impaired the ability of the Policy to perform as represented and sold.

49. For instance, beginning in approximately 1986, defendant introduced the "R-Factor," as an adjustment to the cost of insurance in order to maintain a particular predetermined profit margin.[8] The R-Factor operated to extract the bulk of Great Southern's profits in the first ten years of the Policy's life. In the Cost of Insurance calculation above, the R-Factor would be used to manipulate the value of element (c). In the 1990s, as Great Southern experienced continuing excessive mortality, rather than raising costs of insurance (which must be disclosed and explained to regulators and policyowners), defendants would simply lower the undisclosed R-Factor to achieve the same result. State regulators in Texas criticized Great Southern's use of the R-Factor.

50. Beginning in 1991, Great Southern also breached this contract provision by passing on the DAC tax as an undisclosed cost of insurance. Use of these other factors to determine mortality and cost of insurance is a breach of the terms of the Policies.

### 3.  Great Southern Breached The Performance Terms Of Its Contract

51. Great Southern presented prospective policyowners with Policy illustrations demonstrating how the Policy's values -- death benefits and cash accumulation -- would grow for each year of the Policy's life and the schedule and number of out-of-pocket premiums necessary to sustain those values. Great Southern knew that this

---

[8]    See ¶36, above.

promised Policy performance and number of premium payments required were material to the policyowners' purchase decision and were the key criteria for sale of the product. Thus, illustrations and projected performance were the bases on which the Policies were sold and became implied terms of the insurance contract.

52. Once the Policy was purchased, Great Southern credited different, lower interest crediting rates and higher costs of insurance to the Policies than illustrated. For instance, Great Southern changed from the portfolio method of determining interest crediting rates to the New Money Method, to more aggressively capture the higher New Money rate. Similarly, if Great Southern proposed to reduce the effective interest rate in the sixth Policy year by taking a higher margin on the interest, but illustrated policy performance at the initial rate for the life of the policy, the vanish dates and projected Policy performance would not and could not be achieved. Great Southern further breached these contract terms by demanding that policyowners pay premiums in addition to or in excess of those previously illustrated; by depleting and inducing cash and other values of the Policy to levels less than promised and by terminating or threatening to terminate the Policy notwithstanding the fact that the policyowner had paid all premiums required by the contract.

IV. **GREAT SOUTHERN FAILED TO DISCLOSE MATERIAL INFORMATION AFFECTING THE PERFORMANCE OF THE POLICIES**

53. Great Southern marketed these products through uniform sales and marketing materials and Policy illustrations that

projected how these products would perform.  All of these materials were developed by Great Southern in Dallas and distributed to agents nationwide.  These materials and Policy illustrations failed to inform policyowners of the basic mechanics of these complex products.  Most notably, defendant failed to inform policyowners of the pricing assumptions on which these products were based and the manner in which these assumptions were then manipulated by defendant.   Defendant would inform agents of changes in current interest crediting rates, but never provided the agents with the rationale for the changes or the assumptions behind the rates.  Nor were agents ever told that the promised rates were later being manipulated downward using actuarial artifice built into the policy design.

     54.  Great Southern's uniform Policy illustrations and marketing materials failed to disclose even the most fundamental facts and information concerning the mechanics and performance of its Policies.  Great Southern failed to disclose, *inter alia*, that:

          (a)  based on Great Southern's actuarial manipulations, the cash value, dividends, interest earned and other Policy benefits a policyowner would realize under the Policy will be substantially less than represented and sold;

          (b)  The actual number of out-of-pocket cash premium payments a policyowner would have to pay for his or her Policy would be substantially greater than promised;

          (c)  the representations of Policy performance, including vanish dates, were based on artificially manipulated interest

crediting rates, mortality, expense and other assumptions that were inconsistent with Great Southern's current or projected earnings and investment experience and lacked any reasonable basis in fact;

(d)  the assumptions underlying the representations of policy performance were inconsistent with Great Southern's own internal forecasts, estimates, analyses or projections of these same factors;

(e)  the vanishing premium Policies would not pay for themselves as represented, illustrated and promised by Great Southern;

(f)  Great did not intend to and did not credit interest to the Policies in accordance with the terms of the contract and did not intend to and did not maintain the artificially high interest crediting rates necessary to fund the Policies as illustrated;

(g)  the interest payable under the Policies was extremely sensitive to undisclosed factors concerning external interest rates, including Great Southern's investment portfolio, competition, Great Southern's profit plans, expense and mortality experience, DAC tax, persistency bonuses and lapse rates;

(h)  Great Southern's portfolio contained numerous investments having a substantial exposure to interest rate risks, and that nominal reductions in market interest rates would require Great Southern to reduce disproportionately the interest rates payable on the Policies;

(i)  Great Southern knew that the interest rates payable to policyowners would be materially less than the rates used in the uniform Policy illustrations and representations made to policyowners;

(j)  Great Southern was manipulating its costs of insurance by an undisclosed "R-Factor" in order to extract its profit on each Policy in the early years of the Policy and to disguise increases in mortality expenses; and

(k)  Great Southern knew that nominal deviations from the assumed performance of any of the various factors built into the Policies would have a devastating impact on the performance of the Policy and, for vanishing premium Policies, on the ability of the Policy's out of pocket premiums to vanish.

55.  In furtherance of its fraudulent scheme of selling the Policies as investment, savings, or retirement vehicles, Great Southern failed to disclose to plaintiffs and the Class, among other things, that:

(a)  payments that were characterized as "deposits" or "contributions" were premiums;

(b)  a substantial portion of the premiums they paid would not go toward any investment account, but rather would be used to pay commissions to the agent and other sales and administrative charges to Great Southern, and would be used as mortality charges to purchase life insurance; and

(c)  the true rate of return that would be earned by purchasing the Policy was less than the illustrated rate or the

rates available on other investment vehicles designed for retirement, savings or investment.

56. With its replacement practice, Great Southern uniformly failed to inform plaintiffs and Class Members that they would lose substantial cash values and accumulation values in their existing Policies, be required to pay new and significant commission charges, be subject to new contestability clauses, lose avocation and medical waivers and pay more for insurance as they were purchasing insurance at an older insurable age. Great Southern also failed to inform policyowners that, in many instances, their new Policies would be financed with unauthorized loans taken against the cash or accumulated values in their existing Policies, that the new Great Southern Policy was volatile and interest-sensitive, or that the additional benefits of their new Policy were dependent upon the aggressive and unattainable pricing assumptions described above. This misconduct allowed Great Southern to strip the accumulated cash values from policyowners' existing Policies in order to finance new Policies and to collect substantial interest on the Policy loans which were secured by underlying cash and accumulated values.

57. The sales presentations, marketing materials and Policy illustrations prepared and disseminated by Great Southern and used in replacement sales failed to disclose even the most fundamental facts and information concerning Policy replacement. Great Southern's sales presentations and related marketing materials

misrepresented and/or failed to disclose to plaintiffs and the Class that, *inter alia*:

(a) the replacement Policies were highly leveraged, volatile and interest-sensitive;

(b) performance of the replacement Policies was dependant on aggressive and unattainable pricing assumptions about interest crediting rates, dividend scales, expenses, persistency rates and other critical assumptions;

(c) there were substantial risks that the replacement Policies would not perform as illustrated and promised due to Great Southern's insupportable pricing assumptions;

(d) there are material adverse financial and non-financial consequences whenever a policyowner surrenders or borrows against an existing Policy to purchase a new Policy, even if the new Policy has a higher face amount or death benefit;

(e) the cash value in the existing Policies would be depleted or pledged as collateral for a Policy loan to support the new Policy without their knowledge or permission;

(f) the death benefits of their existing Policies would be eliminated or reduced as a result of loan(s) secured by the cash value of the existing policies;

(g) when the cash value in existing Policies was depleted, the policyowner would owe premiums on the new Policy, premiums on the existing Policy and interest on the Policy loan(s) secured by the cash value of the existing policy;

(h) the agent would earn substantial commissions, which would diminish the cash value otherwise available to the policyowner;

(i) Great Southern would earn substantial sales loads or administrative charges, which would diminish the cash value otherwise available to the policyowner;

(j) if an existing Policy was fully surrendered or lapsed, valuable Policy benefits such as suicide clauses, contestability clauses, favorable Policy loan provisions or "non-forfeiture" values, avocation, and medical waivers would be lost;

(k) the replacement Policy was subject to new underwriting standards, at an older insurable age; and

(l) the transaction exposed the policyowner to numerous undisclosed risks, including tax risks.

58. Without disclosure of these material facts and information, the uniform marketing materials and Policy illustrations prepared, approved and disseminated by Great Southern were inherently false, misleading and deceptive. Had policyowners known of these undisclosed material facts, they would not have purchased their Polices.

59. Great Southern's nationwide uniform scheme and common course of conduct was designed to and did induce tens of thousands of Class Members to purchase Policies from Great Southern. Great Southern received hundreds of millions of dollars in premium income from their improper sale of these Policies. Plaintiffs and the Class, on the other hand, have lost or face losing millions of

dollars in death benefits, cash values, accumulated account values, surrender values and other vested values due to their inability or unwillingness to pay unanticipated additional out-of-pocket premiums on Policies sold pursuant to Great Southern's scheme described here.

60.     Moreover, as these products began to deteriorate, Great Southern began demanding payment of additional and unexpected premiums.    In some instances, Great Southern demanded that the policyowner make additional large lump sum payments into the Policies to make up premium "shortfalls."  Policyowners who did not comply were and are threatened with forfeiture of their Policies. Numerous Class Members have yet to learn that their Policies have substantially declined in death benefits and cash value or that their premium payments will not vanish as promised as a result of Great Southern's misconduct and failure to disclose, and that their Policies will lapse if they do not make additional premium payments.

V.     **GREAT SOUTHERN'S FRAUDULENT CONCEALMENT OF ITS NATIONWIDE FRAUDULENT SCHEME**

61.     Despite exercising reasonable diligence, plaintiffs and Class Members could not discover and were prevented from discovering Great Southern's fraudulent scheme. As a fiduciary to the Class, Great Southern owed plaintiffs and Class Members an affirmative duty of full and fair disclosure, but failed to honor and discharge that duty.  Rather than ensure truthful disclosure of material facts, Great Southern concealed material facts relating to

the deceptive, fraudulent and unlawful conduct alleged herein. This fraudulent concealment began at the time the Policies were sold to plaintiffs and Class Members and continued throughout the Class Period.

62. The marketing materials and Policy illustrations conveyed to plaintiffs and the Class at the time of sale failed to disclose material facts and the fundamental and complex assumptions by which the values demonstrated in the Policy illustrations were determined and altered. Sample Policies were never provided to plaintiffs and Class Members at the point of sale; indeed, the Policies were not even delivered to plaintiffs and Class Members until many weeks or, in some instances, many months later. Defendant would inform agents of changes in current interest crediting rates but never provided the agents with the rationale for the changes or the assumptions behind the rates. Nor were agents ever told that the promised rates were later being manipulated downward using actuarial artifice built into the policy design.

63. The actuarial manipulations undertaken in breach of the Policy contract were not disclosed to policyowners. Policyowners were not informed of the changes in the interest rate credited to

their policies,[9] of the changes in expenses, loads or of the application of other factors such as the "R-Factor."

64. Although Great Southern afforded policyowners a "free look" period after delivery of the Policy, as required by law, the Policies were steeped in incomprehensible insurance jargon, phrased in vague and ambiguous terms. Similarly, the Policies failed to disclose any of the assumptions underlying the representations and Policy illustrations and failed to address or qualify the Policy schedules set forth in these representations and Policy illustrations. This process denied policyowners access to the actual Policy terms at the point of sale and delivered unintelligible Policies which were, by design, substantially different than the product offered for sale. The process was designed to conceal the fraudulent nature of these sales presentations and the material risks of Great Southern's Policies.

65. When policyowners raised concerns about their Policies or inquired about the status of their Policies, Great Southern actively concealed the facts with half-truths and false and misleading statements. Great Southern instructed policyowners to ignore demands for additional premiums, assuring them that it was all a "mixup." In so doing, Great Southern prevented and deterred

---

[9]     The only communication the policyowner received was an annual policy statement. Though the policyowner could compare each of these statements with those issued in prior years and ascertain, for instance, that the interest rate being credited to that policy was declining, nowhere did Great Southern explain the impact of those changes on Policy values or on the number or amount of premium payments.

Case 3:02-cv-00048-RLV-CH   Document 1   Filed 02/01/02   Page 44 of 85

any meaningful inquiry or investigation by policyowners that would have disclosed Great Southern's fraudulent common course of conduct.

66. The running of the statute of limitations has been suspended with respect to any claims that plaintiffs and Class Members have brought as a result of the unlawful and fraudulent course of conduct alleged here. Great Southern, through various devices of secrecy, affirmatively and fraudulently concealed the existence of its scheme and unlawful course of conduct from plaintiffs and the Class. Plaintiffs and the Class had no knowledge of Great Southern's scheme and unlawful course of conduct, or any of the facts that might have led to the discovery of Great Southern's wrongdoing with the exercise of due diligence, until shortly before the filing of plaintiffs' initial complaints.

VI. GREAT SOUTHERN'S FIDUCIARY DUTY AND RELATIONSHIP OF TRUST AND CONFIDENCE TO PLAINTIFFS AND CLASS MEMBERS

67. Great Southern held and holds a relationship of trust and confidence with plaintiffs and Class Members as a result of the following:

(a) Great Southern is an insurer characterized by elements of public interest which subject Great Southern to more stringent standards of conduct than those normally arising out of a contract;

(b) Great Southern cultivated a relationship of trust and confidence with plaintiffs and Class Members, through Great Southern's marketing, sales and servicing of the complex and

sophisticated insurance products purchased by plaintiffs and Class Members;

(c)  the Policies purchased by plaintiffs and the Class were contracts of adhesion that were prepared by Great Southern and were not subject to negotiation.  Plaintiffs and Class Members did not possess bargaining power equal to that of Great Southern;

(d)  policyowners often had prior relationships with Great Southern, which the company and its agents used and manipulated to create trust and confidence in plaintiffs and the Class in order to sell Great Southern policies;

(e)  Great Southern and its agents held themselves out as highly-skilled insurance experts, possessing the special knowledge and expertise needed to interpret and understand the complex and sophisticated insurance products and the funding methods and mechanics of the vanishing premium and policy performance sales. Great Southern encouraged plaintiffs and the Class to rely on this proffered special knowledge and expertise in purchasing the Policies, and counseled plaintiffs and Class Members concerning the complex and specialized insurance they were purchasing;

(f)  Great  Southern  and  its  agents,  in  inducing plaintiffs and the Class to purchase the Policies, held themselves out as experts to and confidants of plaintiffs and the Class, thereby encouraging plaintiffs and Class Members to reveal private and confidential information.  This private and confidential information included financial statements, tax returns, business plans, earnings projections, medical records, driving records,

wills and numerous other estate planning documents and related matters; and

(g) Great Southern knew or should have known that plaintiffs and the Class were unsophisticated insurance consumers, ill-equipped to understand the unfamiliar and technical language of the Policies, or the complex and sophisticated methods of determining the premium payment schedules promised by Great Southern.

68. Based on the foregoing, Great Southern owed plaintiffs and Class Members fiduciary duties, including the duty of good faith and fair dealing, the duty of full and fair disclosure, and the duty of care arising out of its relationship with plaintiffs and Class Members.

69. By engaging in the conduct alleged in this Complaint, Great Southern breached its duties to plaintiffs and Class Members by failing to disclose, while under a duty to do so, numerous material facts set forth more fully in §§III and IV above.

70. In addition to its duties derived from its relationship of trust and confidence, Great Southern had an independent duty to disclose information to plaintiffs and Class Members by virtue of its special relationship with them. Great Southern had sole knowledge of, or access to, material facts concerning, _inter alia_, (a) the relationship between the interest crediting rates and/or dividend scales and related expense charges, and the illustrated and represented premium payments; (b) the factors relied upon by Great Southern in determining interest crediting rates, dividend

scales and expenses; (c) the volatility of those factors in determining interest crediting rates, dividend scales and expenses and Great Southern's ability to manipulate those factors; (d) that even a modest change in interest crediting rates, dividend scales, expenses or other underlying assumptions would dramatically impact the promised Policy performance, including the number of out-of-pocket premiums that would be required to maintain a vanishing premium Policy; and (e) that Great Southern's own internal review, analyses and actuarial data did not support the interest crediting rates and dividend scales utilized in its marketing materials and Policy illustrations. Great Southern was aware that plaintiffs and Class Members had no access to the foregoing information and therefore could not evaluate the accuracy of the information provided to them, because of the specialized nature of actuarial assumptions and the finance and insurance funding methods employed in its representations and Policy illustrations. Great Southern intentionally kept plaintiffs and Class Members uninformed of these facts and capitalized on its sole possession of the material facts.

## VII. GREAT SOUTHERN'S INADEQUATE TRAINING AND SUPERVISION OF AGENTS

71.  Great Southern selected and hired the people it desired to serve as its agents and provided to them the uniform marketing materials discussed above with which to sell its Policies. Great Southern trained its agents in its sales procedures and techniques through uniform training videos, conferences and training packages and brochures.

72.   Great Southern then induced plaintiffs and Class Members
to rely on the special knowledge and expertise of its agents when
purchasing their individual Policies.   However, contrary to the
impression that Great Southern instructed its agents to create, the
agents had little or no expertise or training in finance, or in the
performance or suitability of the Policies they were selling, or in
the material assumptions underlying those products.

73.   Great Southern knew that plaintiffs and Class Members
were generally unsophisticated insurance consumers, unfamiliar with
the technical language of the Policies or the complex method of
determining the premiums and payment schedules represented by Great
Southern.   Great Southern also knew that many of its agents were no
better equipped to comprehend, let alone explain, the intricacies
of the Policies which they sold.   Therefore, Great Southern's
agents relied solely on the sales presentations, uniform sales
scripts, marketing materials and Policy illustrations provided by
Great Southern to induce plaintiffs and Class Members to purchase
the Policies.

74.   Great Southern knowingly failed and refused to supervise
its agents.   Great Southern failed to comply with proper business
practices by refusing to reprimand its agents and failing to notify
state regulatory authorities that its agents were engaging in the
improper activities described here.   Great Southern knew that it
had failed to enact and enforce sufficient internal guidelines on
the use of Policy illustrations, marketing materials or market
conduct.

75. Furthermore, Great Southern implemented poor internal controls for the review of the sale of its Policies, including, but not limited to, "churning" activities which resulted in the purchase of Great Southern Policies to the detriment of plaintiffs and the Class. Great Southern also failed to implement adequate oversight and compliance procedures to ensure that its agents were complying with state insurance laws and regulations, including the filing of proper replacement disclosure forms.

76. In short, Great Southern knew that many of its agents did not have the expertise or training to properly interpret, explain or comprehend the misleading sales presentations, marketing materials and Policy illustrations. On these bases, Great Southern failed to educate, train or supervise its agents to ensure that meaningful and appropriate disclosures were made to prospective policyowners.

VIII. FACTS RELATING TO EACH NAMED PLAINTIFF

A. The Solicitation And Sale Of Harriet D. Mann's Policy

77. In 1987, Harriet Mann was contacted by Great Southern's agent Carmine N. Perez, who suggested that she purchase a $100,000 key person life insurance Policy. The key person insurance was sold on the basis that it would help protect the business that Ms. Mann owned with her husband. Great Southern represented that the premium payments would be $74.99 per month throughout the life of the Policy and that the death benefit would remain at $100,000. Ms. Mann applied for and was subsequently issued a Great Southern

Policy (No. 2096770) on April 22, 1987. Great Southern never informed Ms. Mann that premiums could increase in the future. Ms. Mann faithfully paid the $74.99 monthly premium for seven years. During this seven year period, Great Southern never informed Ms. Mann that she would have to pay any amount other than the $74.99 monthly premium.

78. In September of 1994, Ms. Mann received notice from Great Southern that she owed a lump sum payment of $297.86 in order for the Policy to remain in force for an additional two months. Ms. Mann immediately contacted Great Southern and was told that the payment was necessary because Great Southern's investment returns had been less than projected. This statement was false. The additional payment was necessary because Great Southern breached the insurance contract, applied in the undisclosed actuarial manipulations and sold the Policy based on the undisclosed material assumptions described above. In addition to the lump sum payment, Great Southern provided Ms. Mann with six "policy change" options, each requiring Ms. Mann to increase her monthly premiums in order to maintain the Policy at dramatically reduced face amounts and/or coverage periods. For instance, Ms. Mann was presented the option of increasing her monthly premiums to $85 which would allow her to keep her Policy inforce for only an additional four years at a 50% reduction in the face amount. Angry and dissatisfied, Ms. Mann demanded that her Policy be surrendered, and the cash value refunded. Great Southern then informed Ms. Mann that her Policy had no cash surrender value. Great Southern left Ms. Mann with

- 40 -

only one option; pay an increased premium for a reduced death benefit or lose her coverage.   Ms. Mann refused to pay the increased premium, and her Policy subsequently lapsed.

  **B.** **The Solicitation And Sale Of Irwin Ginsberg's Policy**

  79. In the later part of 1985, Irwin Ginsberg contacted Great Southern's agent, Jack Goldberg. At this time, Mr. Ginsberg owned two Great Southern term life insurance Policies, one purchased in 1983 with a face amount of $100,000 and the second, also a $100,000 Policy, purchased in 1984.

  80. Great Southern represented that Mr. Ginsberg could replace his existing term insurance Policies with a Great Southern "Lifetime" Universal Life Policy requiring level quarterly premium payments of $929.50 throughout the life of the Policy, which was until Mr. Ginsberg reached age 95.   Great Southern further represented that the proposed Policy would provide the same amount of insurance protection at lower net costs than his existing term Policies and would build accumulated cash values that could be used to make premium payments.

  81. Great Southern provided Mr. Ginsberg with a letter and two Policy illustrations.   One computer generated Policy illustration purported to show the Policy's values, death benefit and annual premiums.   This Policy illustration also showed that Mr. Ginsberg's annual premiums would remain level throughout the life of the Policy.

82. The second Policy illustration was hand-written by Great Southern's agent (based upon numbers the agent received from Great Southern) to compare the premium payments and net cost of "Term Protection" to "Money Market Universal Life." This Policy illustration purported to show the stable yearly premium payment required for the universal life Policy as compared to the increasing yearly premium payment on the term protection. The Policy illustration also emphasized the lower net cost of the universal life Policy, which was presented as an absolute figure, as compared to the higher and varying net cost of term insurance. The message was clear: Whereas other insurance policies would vary in cost over the terms of the policies, the universal life Policy carried a low, uniform premium obligation over its term. The letter provided with this Policy illustration reiterated these representations. At no time did Great Southern inform Mr. Ginsberg that his premiums could increase in the future, let alone that the product he purchased carried an inherent risk of huge and disproportionate premium increases.

83. Mr. Ginsberg purchased a Great Southern adjustable life insurance Policy (No. 1595844) with a face amount of $200,000. That Policy was issued on December 3, 1985.

84. In the fall of 1994, when Mr. Ginsberg was 67 years of age, Great Southern increased his quarterly premiums from $929.50 to $1,117. Mr. Ginsberg immediately contacted Great Southern to question the premium increase. By letter dated February 2, 1995, Great Southern informed Mr. Ginsberg that, due to declining

Case 3:02-cv-00048-RLV-CH   Document 1   Filed 02/01/02   Page 53 of 85

interest rates, his Policy's accumulation account value was inadequate to fund the Policy to age 95. This statement was false. The additional payment was necessary because Great Southern breached the insurance contract, or engaged in the undisclosed actuarial manipulations and sold the Policy based on the undisclosed material assumptions described above. In addition, the Policy was now subject to increased mortality charges. The letter provided Mr. Ginsberg with three draconian reproposal illustrations, including continued coverage for a dramatically reduced number of years (to age 70 rather than 95), or coverage to age 95 as originally proposed but with dramatically increased premium payments (increased from $929.50 to $2,754.39 per quarter), approximately 300% higher than the original premium amount that induced him to purchase the Policy. Under this second proposal, Mr. Ginsberg, by age 80, would have paid in premiums more than the death benefit. Mr. Ginsberg surrendered his Policy for its approximately $3,000 cash value in 1996.

C.    The Solicitation And Sale Of Isaac Norman's Policy

85.    In 1986, Isaac Norman was contacted by Robert L. Pacini, an agent for Great Southern, to discuss the purchase of additional life insurance for Mr. Norman and his wife. Great Southern, through its agent, represented that it could provide Mr. Norman with a life insurance Policy that would require level out-of-pocket premium payments for only six or seven years and yet the death benefit would be maintained throughout the life of the Policy. In support of these representations, Great Southern presented

Mr. Norman with vanishing premium Policy illustrations depicting a death benefit that was maintained throughout the Policy's life, with increasing cash surrender values, for a fixed and limited number of out-of-pocket premium payments.

86. Great Southern never disclosed to Mr. Norman its intent to breach the insurance contract and to engage in the actuarial assumptions as described above.

87. Mr. Norman purchased a $300,000 Great Southern Policy (No. 1611254) insuring the life of his wife. The Policy was issued to Mr. Norman on May 15, 1986.

88. Subsequently, Mr. Norman received supplemental Policy illustrations in conjunction with the Policies purchased. These Policy illustrations, similar to the ones provided at the point of sale, depicted a death benefit that was maintained throughout the life of the Policy with increasing cash accumulation values for a fixed and limited number of payments.

89. In 1993, contrary to its representations, Great Southern demanded and Mr. Norman has paid additional out-of-pocket premium payments in order to maintain his Policy. These payments were necessary as a result of Great Southern's breach of the insurance contract and its use of actuarial manipulations and undisclosed assumptions as described above.

### D. The Solicitation And Sale Of Yvonne Massey's Policy

90. In 1982, Yvonne Massey contacted Ralph Williams, an agent of Great Southern. At that time, Ms. Massey already owned a

$50,000 Great Southern whole life insurance Policy which she had purchased in 1980, also through agent Williams. Great Southern, through agent Williams, recommended that Ms. Massey use the cash value in her existing whole life Policy to purchase a new Great Southern "Lifetime" insurance Policy. Great Southern represented that the new Policy was a superior product, was a good investment and could provide retirement funds to Ms. Massey. Great Southern further proclaimed the "flexibility" of the new Policy that would allow Ms. Massey to skip some premium payments without affecting the Policy's death benefit, the periodic premium due and would also allow her to take loans on her accumulated values. In support of these representations, Great Southern provided to Ms. Massey marketing materials and a Policy illustration.

91. Neither Great Southern, nor the marketing materials and Policy illustration presented to Ms. Massey, disclosed the associated risks or costs of Policy replacement. For example, Great Southern never disclosed that Ms. Massey would pay substantial sales commissions and front-end loads or charges for the new Policy or that she would lose valuable Policy benefits upon surrender of her existing Policy. Nor did Great Southern disclose to Ms. Massey that she was replacing her existing Policy with a Policy that was far more volatile, interest-sensitive and laden with risk. Rather, on the application for the new Policy, Great Southern indicated that no insurance would be replaced as a result of the transaction.

92. Ms. Massey agreed to purchase the Great Southern "Lifetime" Policy and to surrender her existing Great Southern Policy.  A Great Southern Policy (No. 1482197) was issued to Ms. Massey on March 24, 1982.

93. It was not until approximately 1997 that Ms. Massey learned of the detrimental effects of Policy replacement and that her Policy had failed to perform as promised by Great Southern.

IX.  INJURY TO THE CLASS

94. The sale of life insurance Policies based upon the fraudulent and deceptive sales scheme described above was an enormous success for Great Southern.  Great Southern received millions of dollars in premium income from the sales of life insurance Policies based upon the uniformly false and misleading sales presentations and other practices described above.  Great Southern induced thousands of existing and new policyowners to purchase permanent life insurance Policies from Great Southern based upon false and misleading sales presentations, marketing materials and Policy illustrations.

95. As a result of Great Southern's fraudulent sales practices and breaches of contract, plaintiffs, together with thousands of similarly situated Members of the Class, were: (a) induced to purchase life insurance Policies through the systematic omissions or misrepresentation of material facts concerning the nature and terms of the Policies and their ability to perform as represented by Great Southern, including their ability to vanish as represented and illustrated; (b) induced to

replace and/or deplete the cash value of existing policies by using or encumbering the cash values accumulated in the existing policies to purchase new Policies from Great Southern; and (c) suffered substantial deteriorating policy performances based on Great Southern's manipulation of interest crediting rates and costs of insurance.

96. As a direct and proximate result of Great Southern's fraudulent and improper course of conduct, plaintiffs and the Class have sustained and continue to sustain substantial injuries and damages, including:

(a) the payment of premiums in excess of the amounts represented by Great Southern at the time the Policies were purchased;

(b) the loss and/or diminution of death benefits, accumulated cash values, paid-up additions and/or other insurance benefits compared to those represented at the time the Policies were purchased;

(c) the loss of valuable policies issued by Great Southern or its competitors in order to purchase the Policies;

(d) the payment of additional premiums, life insurance costs, charges and fees; and

(e) the payment of interest charges on policy loans and/or surrender charges on cash values used to pay premiums on the new life insurance Policies.

97. Plaintiffs and Class Members have suffered and will suffer harm as a direct and proximate result of the wrongful

47

conduct alleged in this Complaint. Plaintiffs and Class Members have lost or face the prospect of losing hundreds of millions of dollars in death benefits, cash values, surrender values and lifetime income due to their inability or unwillingness to pay additional premiums on a Policy or Policies they were told would require no future premium payments. Likewise, Class Members have been and will be forced to pay millions of dollars in additional premiums they never agreed or expected to pay.

98. Many Class Members are elderly persons in or nearing retirement who cannot afford to pay premiums on life insurance for the remainder of their lives. Many Class Members are now uninsurable at any affordable cost and will be unable to obtain additional insurance on their lives for the benefit of their families and their estates. Without the equitable and injunctive relief sought herein, plaintiffs and Class Members will continue to suffer irreparable harm.

99. Great Southern had both the duty and the ability to review its marketing materials systematically and to establish adequate internal controls to prevent the deceptive sales practices alleged herein. Instead, however, Great Southern intentionally failed and refused to discourage or stop the deceptive sales practices and, rather, authorized, encouraged and ratified the misconduct of its agents to perpetrate its fraudulent scheme.

X.    CLASS ACTION ALLEGATIONS

100. This action is properly brought as a class action under Fed. R. Civ. P. Rules 23(a) and (b). The Class means all persons

- 48 -

or entities who had, at any time during the Class Period, an ownership interest in one or more Policies; provided, however, that Class or Class Members does not include (unless such persons or entities are Class Members by virtue of their ownership interest in other Policies) (a) any person or entity who: (i) while represented by counsel in the settlement of an actual or threatened lawsuit, signed a document that releases the Company from any further claims concerning such Policy or Policies; (ii) has or had ownership of a policy that is included in the class certified on April 18, 2000 in *McCulley v. Great Southern Life Insur. Co. et al.* No. 3:98:CV-2466-G (N.D. Tex. Dallas Div.); (iii) has or had ownership of a Policy that is timely excluded from the Class; (iv) has or had ownership of a Policy that terminated, where a death benefit was paid under the Policy due to the death of the insured; or (v) has or had ownership of a Policy that has terminated prior to January 1, 1993; or (b) any insurance company that has or had ownership of a Policy pursuant to an absolute assignment effected as part of an exchange under section 1035 of the Internal Revenue Code. "Class Period" means the period from January 1, 1982, to December 31, 1999. This action is properly brought as a class action under Rule 23 for the following reasons:

(a)  membership in the Class is so numerous as to make it impractical to bring all Class Members before the Court. The exact number of Class Members is unknown but can be determined from Great Southern's records. Although plaintiffs do not presently know the

location of all Class Members, their identities and addresses can be readily ascertained from Great Southern's records.

(b)   the Class representatives are Members of the Class described above.   Great Southern subjected them to the same nationwide scheme and common course of conduct alleged above, and they purchased life insurance Policies from Great Southern based upon the scheme and common course of conduct.

(c)   there are numerous and substantial questions of law or fact common to all the Members of the Class which control this litigation and predominate over any individual issues.   These common questions include the following:

(i)   whether Great Southern materially breached its Policy contracts;

(ii)   whether Great Southern devised and deployed a scheme or artifice to conceal material facts from plaintiffs and Class Members;

(iii)   whether Great Southern systematically failed to disclose to plaintiffs and Class Members material information such as the critical assumptions underlying the operation and performance of it Policies;

(iv)   whether Great Southern developed, encouraged and engaged in a scheme designed to sell new Policies through fraudulent concealment of material facts;

(v)   whether Great Southern misrepresented to plaintiffs and Class Members the promised performance of their Policies by failing to disclose that the excess interest crediting

rates represented in the uniform sales presentations and Policy illustrations approved and prepared by it had no reasonable basis in fact and were not supported by Great Southern's current or anticipated experience;

(vi)   whether the interest crediting rates, dividend scales, cash values, accumulated values, assumptions, mortality experience, expenses, lapse rates, persistency bonus assumptions, interest rate and investment return projections were established based on factors other than those disclosed in Great Southern's Policy contracts;

(vii)   whether the interest crediting rates, dividend scales, cash values, accumulated values, assumptions, mortality experience, expenses, lapse rates, interest rate and investment return projections underlying Great Southern's sales presentations, marketing materials and Policy illustrations were inconsistent with or contrary to Great Southern's internal forecasts, business plans, estimates, analyses or projections;

(viii)   whether Great Southern breached its contracts with plaintiffs and Class Members by improperly charging the DAC tax to Policies through undisclosed changes in interest crediting rates, adjustments to monthly deductions, cost of insurance or other Policy expenses;

(ix)   whether Great Southern improperly reduced interest crediting rates on its Policies or improperly increased cost of insurance rates on Policy loans based upon direct recognition;

(x) whether Great Southern misrepresented or concealed at the time of sale and thereafter the number and/or amount of out-of-pocket premium payments a policyowner would have to pay and the cash values, accumulated account values, surrender values and/or benefits a policyowner would realize based on a particular number or amount of out-of-pocket premium payments;

(xi) whether the uniform sales presentations, marketing materials and/or Policy illustrations presented to plaintiffs and Class Members omitted material facts relating to interest crediting rates, dividend scales, lapse rates, premiums, cash values, surrender values, death benefits, the use of direct recognition, the New Money Method, investment returns and income payable and its practice of alternating crediting methods to represent the interest payable on the Policies;

(xii) whether Great Southern failed to disclose to plaintiffs and Class Members that the replacement or use of cash values or accumulated values from existing Policies in order to purchase new Policies would cause the loss of substantial benefits available in the existing policies;

(xiii) whether Great Southern failed to disclose to plaintiffs and Class Members that the replacement Policies sold to them were highly leveraged insurance Policies that would not and could not perform as illustrated;

(xiv) whether Great Southern failed to adequately supervise, educate and train its agents regarding the terms of its Policies, appropriate methods of sales presentations, creation and

utilization of Policy illustrations, replacement of Policies, and compliance with state and federal laws (including state insurance laws and regulations), and whether Great Southern's failure to do so constituted a means by which Great Southern engaged in the scheme described herein;

(xv) whether Great Southern negligently hired, retained or promoted agents to sell Policies to plaintiffs and Class Members, when such agents engaged in the wrongful practices alleged herein;

(xvi) whether Great Southern engaged in a nationwide fraudulent course of conduct in order to induce the purchase of the Policies by plaintiffs and Class Members;

(xvii) whether plaintiffs and Class Members are entitled to specific performance, injunctive relief or other equitable relief against Great Southern; and

(xviii) whether plaintiffs and Class Members have sustained damages, are entitled to an award of punitive damages and the proper measure of such damages.

These common omissions obviate any need to solicit individual testimony as to each element of plaintiffs' causes of actions.

(d)  The claims asserted by plaintiffs are typical of the claims of Class Members and plaintiffs have no interest adverse to the interests of other Class Members;

(e)  Plaintiffs will fairly and adequately protect the interests of the Class; and have retained counsel experienced in class and complex litigation; and

(f)  A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(i)  without a class action, Class Members will continue to suffer damages, Great Southern's violations of law will proceed without remedy, and Great Southern will continue to retain the proceeds of its misconduct;

(ii)  given (a) the substantive complexity of this litigation, (b) the size of individual Class Members' claims (which, though significant individually, pale compared to the corpus of Great Southern's ill-gotten gains), and (c) the limited resources of the Class Members, many of whom are elderly, few, if any, Class Members could afford to seek legal redress individually for the wrongs Great Southern has committed against them;

(iii)  this action will foster an orderly and expeditious administration of class claims, economies of time, effort and expense, and uniformity of decision; and

(iv)  This action presents no difficulty that would impede the Court's management of it as a class action, and it is the best available means by which Members of the Class can seek redress for the harm caused to them by Great Southern.

101. Because plaintiffs seek injunctive relief and corresponding declaratory relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Members of the Class which would establish

incompatible standards of conduct for Great Southern. Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

XI. CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION
### (Breach of Contract)

102. Plaintiffs repeat and reassert the allegations contained in the paragraphs above as if fully set forth herein.

103. Great Southern entered into express contracts with policyowners to provide specified life insurance benefits in accordance with the terms and conditions of those Policies. These Policies were drafted by Great Southern as adhesion contracts in which the prospective policyowner had no bargaining power as to the terms of the Policy.

104. Great Southern expressly stated in its contract of insurance that interest crediting rates would be determined based on "the Company's expectation of future interest rates." Great Southern breached this policy term by using numerous actuarial manipulations, other than its expectations of future interest rates, to set the interest crediting rates on these Policies. Those actuarial manipulations included direct recognition, use of teaser rates, use of undisclosed interest margin increases, changes from portfolio to New Money investment accounting; improper

imposition of the DAC tax as a reduction in interest crediting rates, and others as described above.

105. Similarly, Great Southern expressly stated in its contract of insurance that its cost of insurance rates would be determined based on "the Company's expectation of future mortality experience." Great Southern breached its policy terms by using numerous actuarial manipulations other than its expectation of future mortality experience, to set the rates on these Policies, including its undisclosed use of the "R-Factor" and the imposition of the DAC tax through increased cost of insurance charges.

106. The insurance Policies delivered by Great Southern to plaintiffs and Class Members after the sale of the Policies are not complete integrations of the underlying agreements. The form insurance Policies, which were drafted by Great Southern, are contracts of adhesion that were neither negotiated nor bargained for by the parties. The Policies are cast in vague and ambiguous language that is incomprehensible to ordinary consumers, do not address or set forth all of the terms of the underlying agreements and were not intended as a complete integration of the parties' agreements. Great Southern knew and expected that policyowners would rely on the Policy illustrations as encapsulating the key Policy terms and how the Policy would operate.

107. The agreements between Great Southern and plaintiffs and Class Members consist of: (a) the written Policy illustrations provided to Plaintiffs and Class Members by Great Southern; (b) the other uniform written representations made to plaintiffs and Class

Members by Great Southern; and (c) the Policy applications, Policies, riders and other preprinted forms drafted by Great Southern.

108. Great Southern materially breached and repudiated its duties under the agreements with plaintiffs and Class Members by, _inter alia_:

(a) demanding that plaintiffs and Class Members pay premiums in addition to those required by the terms of their agreements with Great Southern;

(b) depleting and reducing the cash values, death benefits and other values of plaintiffs' and Class Members' Policies to levels less than promised under their agreements with Great Southern;

(c) terminating and/or threatening to terminate plaintiffs' and Class Members' Policies notwithstanding their payment of all out-of-pocket premiums required by their agreements;

(d) changing the terms and conditions of new Policy contracts by borrowing against, surrendering or discontinuing existing policies in connection with the purchase of the new Policies;

(e) changing the terms and conditions of Policy contracts by employing the concept of direct recognition, thereby reducing the dividends and/or interest rates earned by the Policy and breaching the loan interest rate provision;

Case 3:02-cv-00048-RLV-CH   Document 1   Filed 02/01/02   Page 68 of 85

(f) changing the terms and conditions of the Policy by applying investment plan payments and costs associated with the DAC tax to the costs and charges of life insurance; and

(g) changing the terms and conditions of Policy contracts through the use of other actuarial manipulations such as the R-Factor.

109. In connection with the Policies issued to plaintiffs and Class Members, an implied covenant of good faith and fair dealing existed, and continues to exist, such that Great Southern impliedly covenanted that it would do nothing to impair or frustrate the rights of plaintiffs and Class Members to receive the benefits they had been promised.

110. By failing to disclose material facts adversely affecting those benefits, Great Southern breached the implied covenant of good faith and fair dealing it owed to plaintiffs and Class Members.

111. Plaintiffs and Class Members performed their contractual obligations by making the cash premium payments required under their agreements with Great Southern.

112. As a result of Great Southern's breach of the implied covenant of good faith and fair dealing, Great Southern has wrongfully received, and continues to wrongfully receive, substantial benefits consisting of millions of dollars in additional premiums and commissions. In addition, given the unique nature of the Policies and the corresponding benefits to plaintiffs and the Class, a decree of specific performance is appropriate.

113. By reason of the foregoing, plaintiffs and Class Members have been harmed and damaged in an amount to be determined at the trial in this action.

> B.    SECOND CAUSE OF ACTION
>        (Violation of Tex. Bus. & Comm. Code §§17.46(a)
>        and (b)(5), (9) and (23))

114. Plaintiffs repeat and reassert the allegations contained in the paragraphs above as if fully set forth herein.

115. Plaintiffs and Members of the Class are "consumers" under Tex. Bus. & Comm. Code §17.45(4).

116. The transactions involving the sale of insurance that are the subject of this lawsuit involve "services" under Tex. Bus. & Comm. Code §17.45(2).

117. Great Southern has violated Tex. Bus. & Comm. Code §17.46(a) and (b)(5), (9) and (23), which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . [involving] representing that goods or services have sponsorship, approval, characteristics . . . benefits, or quantities which they do not have" ((b)(5)); "advertising goods or services with intent not to sell them as advertised" ((b)(9)); and "fail[ing] to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed" ((b)(23)).

118. Great Southern's misrepresentations and omissions of the material facts set forth above defrauded plaintiffs and Members of the Class in violation of Tex. Bus. & Comm. Code §§17.46(a) and (b)(5), (9) and (23) in at least the following manner:

(a) Great Southern's acts and practices constitute misrepresentations that its insurance products sold to plaintiffs and the Class have characteristics, benefits or uses which they do not have;

(b) Great Southern advertised its insurance products to plaintiffs and the Class with the intent not to sell them as advertised; and

(c) Great Southern has failed to disclose material information concerning its insurance products to induce plaintiffs and the Class to purchase the insurance products which plaintiffs and the Class would not have purchased if the information had been disclosed.

119. Great Southern's wrongful conduct was a producing cause of the damages suffered by plaintiffs and the Class in an amount to be determined at trial.

120. Plaintiffs seek all appropriate relief, including equitable and provisional remedies to the extent their remedy at law is inadequate and to prevent irreparable harm.

C.   **THIRD CAUSE OF ACTION**
     **(Fraud, Fraudulent Concealment and Deceit)**

121. Plaintiffs repeat and reassert the allegations contained in the paragraphs above as if fully set forth herein.

122. Great Southern knowingly or recklessly failed to disclose material information to plaintiffs and Class Members that it was under a duty to disclose.

123. For example, Great Southern's uniform Policy illustrations, and marketing materials failed to disclose even the most fundamental facts and information concerning the mechanics and performance of its Policies. Great Southern failed to disclose, *inter alia*, that:

(a)  based on Great Southern's actuarial manipulations, the cash value, dividends, interest earned and other Policy benefits a policyowner would realize under the Policy will be substantially less than represented and sold;

(b)  the actual number of out-of-pocket premium payments a policyowner would have to pay for his or her Policy would be substantially greater than promised;

(c)  the representations of Policy performance, including vanish dates, were based on artificially manipulated interest crediting rates and dividend scales that were inconsistent with Great Southern's current or projected earnings and investment experience and lacked any reasonable basis in fact;

(d)  the Policy illustrations were based on expense, mortality and other assumptions that did not reflect Great Southern's current or anticipated experience and lacked any reasonable basis in fact;

(e)  the assumptions underlying the representations of Policy performance were inconsistent with Great Southern's own

internal forecasts, estimates, analyses or projections of these same factors;

(f) the vanishing premium Policies would not pay for themselves as represented, illustrated and promised by Great Southern;

(g) Great Southern did not intend to and did not credit interest to the Policies in accordance with the terms of the contract and did not intend to and did not maintain the artificially high interest crediting rates and/or dividend scales necessary to fund the Policies as illustrated;

(h) the interest and dividends payable under the Policies were extremely sensitive to undisclosed actuarial factors including interest rates, Great Southern's investment portfolio, competition, Great Southern's profit plans, expense and mortality experience, the "R-Factor," persistency bonuses and lapse rates;

(i) Great Southern's portfolio contained numerous investments having a substantial exposure to interest rate risks, and that nominal reductions in market interest rates would require Great Southern to reduce disproportionately the interest rates and/or dividend scales payable on the Policies;

(j) Great Southern knew that the dividend scales and interest rates payable to policyowners would be materially less than the rates projected in the uniform Policy illustrations and representations made to policyowners;

(k) Great Southern was manipulating its costs of insurance by an undisclosed "R-Factor" in order to extract its

profit on each Policy in the early years of the Policy and to disguise increases in mortality expenses;

(1) Great Southern knew that nominal deviations from the assumed performance of any of the various factors built into the Policies would have a devastating impact on the performance of the Policy and, for vanishing premium Policies, on the ability of the Policy's out of pocket premiums to vanish; and

(m) Great Southern knew that the dividend scales and interest rates payable to policyowners would be materially less than the rates projected in its Policy illustrations and/or represented to policyowners at the time of sale and the resulting negative impact on Policy values, performance and premium paying periods.

124. At the time that Great Southern made these omissions of fact and others, alleged throughout this Complaint, it knew these omissions made its representations false, or made them in reckless disregard for their truth or falsity. Great Southern knew such information was material and knew that such information was not disclosed. Moreover, Great Southern had a duty to plaintiffs and Class Members to disclose such facts, and to ensure that all of its statements and representations were complete, truthful and not false or misleading.

125. Great Southern intended for plaintiffs and Class Members to rely on the foregoing omissions of fact, based on the method and manner of the sales presentations as set forth throughout this Complaint. Great Southern had many opportunities to disclose and

correct the materially misleading information, yet Great Southern elected to continue on its course in order to sell more Policies, and maintain them in force, to increase profitability and maintain a competitive position.

126. Plaintiffs and Class Members were unaware that Great Southern's representations were false and that it had not disclosed material information.  Plaintiffs and Class Members reasonably relied on Great Southern's representations, acted on them to their detriment by purchasing the Policies and continuously making substantial premium payments. Plaintiffs and Class Members were unaware of Great Southern's material misrepresentations and nondisclosures, and could not have discovered them through reasonable diligence as a result of Great Southern's conduct in fraudulently concealing its wrongdoing, as described more fully elsewhere in this Complaint.

127. By reason of the foregoing, plaintiffs and Class Members have been harmed and are entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

D.    FOURTH CAUSE OF ACTION
      (Unjust Enrichment)

128. Plaintiffs repeat and reassert the allegations contained in the paragraphs above as if fully set forth herein.

129. Defendants received from plaintiffs and Class Members premiums and interest in excess of those to which they were entitled under the terms of the insurance contract.

130. As a result, Great Southern will be unjustly enriched if it is allowed to retain such funds. Plaintiffs and Class Members are entitled to restitution of all monies wrongfully obtained by Great Southern.

131. Plaintiffs and Class Members have no adequate remedy at law.

132. As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid by plaintiffs and Class Members, including Policy premiums, sales loads, Policy service charges and other expenses and fees charged by Great Southern. Such monies are traceable to Great Southern, which is the current possessor of such funds.

E.    FIFTH CAUSE OF ACTION
      (Declaratory and Injunctive Relief -- Breach of
      Contract)

133. Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if fully set forth herein.

134. As stated above, Great Southern, through its agents, affirmatively represented, and continues to represent, through written Policy illustrations, that the out-of-pocket premiums on Policies sold pursuant to the vanishing premium sales practice would vanish at a date certain (either at the inception of the Policy where a lump-sum prepayment of premiums is made, or after a limited number of years where the Policy illustration requires payment of out-of-pocket premiums for a specific number of years). Great Southern continues to charge premiums to purchasers of such

Policies after the "vanish date." In addition, Great Southern continues to collect premiums beyond those promised and illustrated. If such premiums are not paid as charged, Great Southern terminates or threatens to terminate the Policies. Great Southern continues to induce existing policyowners to replace their existing policies with new Policies, without disclosing material information concerning the detriment to policyowners and the benefits to Great Southern. Finally, Great Southern continues to represent to purchasers of its Policies that they are purchasing retirement/investment plans while downplaying the fact that they are purchasing life insurance Policies.

135. Plaintiffs, on behalf of themselves and the Class, seek a judgment declaring that Great Southern must provide Policy benefits consistent with its uniform sales presentations, Policy illustrations and Policy terms.

136. Plaintiffs, for themselves and on behalf of Class Members seek injunctive relief enjoining Great Southern from: (a) terminating the Policies of any policyowners who fail or refuse to pay the premiums past the "vanish date" or as otherwise promised or shown in the Policy illustration given to the policyowner at the time of sale; (b) from demanding additional out-of-pocket premiums from policyowners beyond the date set forth in the Policy illustrations provided to policyowners at the time of sale; (c) soliciting policyowners to replace existing policies with new Policies without adequate disclosure concerning the detriments of replacement to the policyowners and the benefits reaped by Great

Southern due to replacement; and (d) soliciting plaintiffs and Class Members to purchase its Policies based upon the retirement/investment plan sales scheme disclosed herein.

137. Plaintiffs and Class Members have no adequate remedy at law.

138. By reason of the foregoing, plaintiffs and Class Members are entitled to declaratory and injunctive relief as set forth above.

F. **SIXTH CAUSE OF ACTION**
   **(Reformation)**

139. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

140. As alleged herein, Great Southern promised plaintiffs and Class Members that they would need to make out-of-pocket premium payments for only a stated number of years (either prepaid at the inception of the Policies or paid annually for a limited number of years), and thereafter the Policies would pay for themselves without any additional out-of-pocket premium payments from plaintiffs or Class Members, and that the Policies would continue to accrue substantial cash and surrender values and death benefits over the life of the Policies.

141. As alleged herein, Great Southern promised plaintiffs and Class Members that they could purchase new and more beneficial Policies using the excess value and accrued dividends of their existing policies, without needing to deplete the value of or incur a loan against the existing policy.

142. As alleged herein, Great Southern promised plaintiffs and Class Members that they could purchase retirement or savings plan products that had no, or only an insignificant life insurance component.

143. The Policies delivered to plaintiffs and the Class by Great Southern after the contracts had already been entered into and partially and/or fully performed do not contain contractual provisions setting forth the parties' agreements, as alleged above.

144. As alleged herein, the Policies were procured by plaintiffs and Class Members from Great Southern as a result of its promises, fraudulent and negligent misrepresentations, fraudulent concealment and constructive fraud. In addition, to the extent there are any differences between the respective expectations and understanding of the parties, these differences are the result of a mutual mistake of fact. Finally, the reasonable expectations of plaintiffs and Class Members concerning the Policies are not set forth in the written Policies.

145. As a result of the foregoing, plaintiffs and Class Members are entitled to equitable reformation of the Policies, to provide for the respective rights and duties agreed to by the parties.

G.   **SEVENTH CAUSE OF ACTION**
     **(Negligent Supervision)**

146. Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

147. Great Southern owed plaintiffs and the Class a duty to act with reasonable care in retaining, training and supervising its agents. Specifically, Great Southern breached its duties to plaintiffs and the Class by failing, _inter alia_, to supervise its agents' conduct in selling Great Southern's policies; to ensure that the sales were conducted in accordance with the law; to ensure that the agents fully disclosed all material facts and did not omit such facts to the Class in conducting such sales; and to use reasonable care, skill and judgment in the sale of Great Southern's life insurance Policies. Great Southern could have reasonably foreseen that a failure to exercise such care would cause injury to the Class.

148. With full knowledge of the scheme being conducted, or with intentional or negligent ignorance of that scheme, Great Southern, through its management, recklessly and/or negligently failed to prevent, discourage or halt its agents from engaging in such deceptive sales practices.

149. Thus, Great Southern recklessly, wantonly and/or negligently failed to properly educate, supervise, regulate and discipline its agents, including the agents who dealt with the named plaintiffs herein.

150. As a direct and proximate result of the foregoing, plaintiffs and the Class have been damaged.

## XII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and on behalf of the Class defined herein, pray for judgment and relief as follows:

1.    An order certifying that the action may be maintained as a class action pursuant to Rule 23b(2) and (3) of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in an amount to be proven at trial, including any damages as may be provided for by statute;

3.    An order requiring disgorgement and/or imposing a constructive trust upon or an attachment or impounding of Great Southern's ill-gotten monies and/or freezing Great Southern's assets and requiring Great Southern to pay restitution to plaintiffs and all Class Members and to restore all funds acquired by means of any act or practice declared by this Court to be unlawful or fraudulent;

4.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity or statutory provisions sued hereunder, including specific performance, reformation and imposition of a constructive trust upon or otherwise restricting the proceeds of Great Southern's ill-gotten funds to ensure plaintiffs and Class Members have an effective remedy;

5.    Award of reasonable costs and disbursements incurred in connection with this action, including reasonable expenses and attorneys' fees, expert witness fees and other costs;

6.    Award pre- and post-judgment interest; and

7.   Such other and further relief as the Court deems just and proper.

JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues triable at law.

DATED:  March 29, 2001

HUBBARD & BIEDERMAN, L.L.P.


STEPHEN L. HUBBARD
STATE BAR NO.10140500
ROBERT W. BIEDERMAN
STATE BAR NO. 02301050
DAVID M. GROSSMAN
STATE BAR No. 00787598
1717 Main Street, Suite 4700
Dallas, Texas 75201
(214) 857-6000
(214) 857-6001 (fax)

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
JOHN J. STOIA, JR.
ANDREW W. HUTTON
TIMOTHY G. BLOOD
LESLIE E. HURST
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
MELVYN I. WEISS
BARRY A. WEPRIN
BRAD N. FRIEDMAN
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone:  212/594-5300

JAMES, HOYER, NEWCOMER, FORIZS
   & SMILJANICH, P.A.
W. CHRISTIAN HOYER
JOHN R. NEWCOMER
JUDY S. HOYER
One Urban Centre, Suite 147
4830 West Kennedy Blvd.
Tampa, FL  33609
Telephone:  813/286-4100

ARNZEN, PARRY & WENTZ, P.S.C.
RONALD R. PARRY
128 East Second Street
Covington, KY  41011
Telephone:  606/431-6100

SCHIFFRIN & BARROWAY, LLP
RICHARD S. SCHIFFRIN
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
Telephone:  610/667-7706

BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
4041 N. Central Avenue
Suite 1100
Phoenix, AZ  85012-3311
Telephone:  602/274-1100

BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
H. SULLIVAN BUNCH
57 Carriage Hill
Signal Mountain, TN  37377
Telephone:  423/886-9736

GOODKIND LABATON RUDOFF
   & SUCHAROW, LLP
EMILY C. KOMLOSSY
PETER H. RACHMAN
International Building
2455 E. Sunrise Blvd.
Suite 813
Fort Lauderdale, FL  33304
Telephone:  954/630-1000

GOODKIND LABATON RUDOFF
  & SUCHAROW, LLP
IRA A. SCHOCHET
100 Park Avenue, 12th Floor
New York, NY 10017-5563
Telephone: 212/907-0700

LAW OFFICES OF LAURENCE D.
  PASKOWITZ
LAURENCE D. PASKOWITZ
87-45 Queens Blvd., 11th Floor
Rego Park, NY 10017-5563
Telephone: 718/830-6330

MOORE, LANDREY, LLP
ETHAN L. SHAW
390 Park Street, Suite 550
Beaumont, TX 77701
Telephone: 409/835-3891

WHATLEY DRAKE, LLC
CHARLENE CULLEN
JOE R. WHATLEY, JR.
RUSSELL JACKSON DRAKE
505 North 20th Street
1100 Financial Center
Birmingham, AL 35203-2605
Telephone: 205/328-9576

PARSONS & SUTTON
WILLIAM CAMERON PARSONS
601 Greensboro Avenue
Suite 700
Tuscaloosa, AL 35401
Telephone: 205/349-5500

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via hand delivery, on this _29_ day of March, 2001, on the following:

Edwin R. DeYoung, Esq.
Roger B. Cowie, Esq.
Locke, Liddell & Sapp LLP
2200 Ross Avenue
Dallas, TX 75201

David M. Grossman